PILLSBURY WINTHROP SHAW PITTMAN, LLP
CAROLYN S. TOTO (SBN 233825)
carolyn.toto@pillsburylaw.com
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
Telephone:   (213) 488-7238
Facsimile:    (213) 629-1033

PILLSBURY WINTHROP SHAW PITTMAN LLP
SAMUEL V. EICHNER (pro hac vice to be filed)
sam.eichner@pillsburylaw.com
31 West 52nd St.
New York, NY 10019
Telephone:   (212) 858-1154
Facsimile:    (212) 858-1500

Attorneys for Plaintiff
OLIVET UNIVERSITY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLIVET UNIVERSITY,<br><br>                  Plaintiff,<br><br>  vs.<br><br>OLIVET COLLEGE,<br><br>                 Defendant. | **COMPLAINT FOR DECLARATORY JUDGMENT OF TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW**<br><br>**Jury Trial Demanded** |

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

Plaintiff Olivet University, LLC (hereinafter referred to as "Plaintiff" and "the University") alleges as follows:

1.      This is a civil action against Defendant Olivet College (hereinafter referred to as "Defendant" and "the College") for a declaratory judgment of trademark invalidity pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Lanham Act, 15 U.S.C. §§ 1119; civil fraud under the Lanham Act, 15 U.S.C. § 1120; breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel under California state law; and violations of California's Unfair Competition Law ("UCL"), Business and Professions Code §§ 17200 et seq.

2.      In 2015, after more than a decade of peaceful coexistence between the University's OLIVET UNIVERSITY trademark and the College's OLIVET COLLEGE school name, the parties executed a binding trademark coexistence agreement (the "2015 Agreement") to formalize the longstanding coexistence of their respective uses.  In 2021, after agreeing not to challenge the University's trademark rights, and to cooperate in good faith to address consumer confusion, the College materially breached the 2015 Agreement by repudiating the agreement, petitioning to cancel the University's OLIVET UNIVERSITY trademark registration before the U.S. Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("USPTO") (the "Cancellation Action"), and failing to cooperate with the University in good faith.  After months of unsuccessful attempts to settle the Cancellation Action and convince the College to honor the 2015 Agreement, the University has filed this civil action to enforce the 2015 Agreement and maintain the status quo acknowledged and agreed to therein.

3.      Alternatively, if for any reason the 2015 Agreement cannot be enforced, the University seeks a declaration that the College's alleged trademark rights in the OLIVET COLLEGE mark are invalid due to abandonment from uncontrolled use, fraud on the USPTO, and as geographically descriptive of a college located in the

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

town of Olivet, Michigan, as well as a declaration that the University's uses of OLIVET-formative marks do not infringe on any such trademark rights, not only because such rights are invalid, but also because the parties' uses have peacefully coexisted for many years without a single known instance of actual confusion.

4.     The University also seeks damages against the College resulting from civil fraud for fraudulent registration before the USPTO as well as for violations of California's UCL stemming from the College's unlawful, unfair, and fraudulent conduct.

## JURISDICTION AND VENUE

5.     This case arises under the Declaratory Judgment Act and the federal Lanham Act.  Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331, and this Court has supplemental jurisdiction over the state law claims pled herein pursuant to 28 U.S.C. § 1367.

6.     This Court also has diversity jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332, as Plaintiff is a university organized in California and Defendant is a college organized in Michigan, such that the parties are completely diverse, and the amount in controversy exceeds $75,000.

7.     This Court has personal jurisdiction over Defendant at least because Defendant entered into a contractual relationship with Plaintiff in California, undertook continuing contractual obligations to the Plaintiff in California, and repudiated and breached that contract by letter addressed to Plaintiff in California, causing harm to Plaintiff in California.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1367 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.  Specifically, Plaintiff, the owner of the OLIVET

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

1    UNIVERSITY trademark, is located in this district, the parties entered an ongoing

2    contractual relationship in this district, and Defendant's Cancellation Proceeding,

3    contractual breaches, and tortious conduct have each harmed Plaintiff in this district.

4                                    **THE PARTIES**

5         9.      Plaintiff is a California non-profit corporation with a principal place of

6    business at 36401 Tripp Flats Rd, Anza, California 92539.  Plaintiff operates an

7    institution of biblical higher education that is dedicated to training Christian ministry-

8    bound men and women as biblical scholars and leaders.

9         10.     Defendant is a Michigan corporation with an address at 320 S. Main

10   Street, Olivet, Michigan 49076. Defendant operates a college, located in the town of

11   Olivet, Michigan, which provides undergraduate and graduate-level education.

12                                 **OLIVET UNIVERSITY**

13        11.     Plaintiff, Olivet University, traces its roots back more than 20 years to the

14   co-founding of Olivet Theological College & Seminary ("OTCS") in the year 2000.

15   OTCS was formed as a bible college that trained denominational ministers and served

16   as a foundational educational institution for mission-bound students.

17        12.     In 2004, Olivet University was formed (hereinafter referred to, together

18   with predecessor OTCS, as "the University") to encompass not only seminary

19   education and ministry training but other educational offerings through various

20   schools and degree programs that simultaneously expanded the scope of the

21   University's curricula while offering a unique and fundamentally faith-based

22   educational institution indelibly tied to spirituality, evangelistic growth, biblical

23   competence, and ministry impact.

24        13.     In doing so, the University succeeded in crafting a unique curriculum that

25   unified its ideals of faith-based education with various modern (and, in some cases,

26   technology-focused) degree programs and offerings.

27        14.     The University's focus on faith-based biblical education is readily

28                                          3

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT,
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL,
CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

apparent to applicants even before they apply to matriculate to the University.  In fact, University applicants are required to submit pastoral references pertaining to their mature Christian character, and an essay related to their faith in Jesus Christ in a manner that demonstrates "a strong Christian character, potential for effectiveness in Christian ministry, and the scholastic ability and emotional maturity to handle a higher education experience."

15.     Currently, the University boasts a broad range of degree programs, including programs offered through the University's Olivet Theological College and Seminary, Jubilee College of Music, Olivet School of Media and Communication, Olivet School of Art & Design, Olivet Institute of Technology, Olivet School of Language Education, Olivet Business School, Zinzendorf School of Doctoral Studies, Olivet School of Engineering and Architecture, and Olivet School of Agriculture.  All such programs are faith-based, biblical education programs with the goal of preparing their graduates for a life in successful Christian ministry.

16.     The University provides its faith-based curricula through several campuses throughout the U.S. including in Riverside, Southern California; San Francisco, California; St. Louis, Missouri; Washington D.C.; Nashville, Tennessee; and Orlando, Florida.

17.     Each University campus boasts unique strengths.  For example, the University's oldest campus in San Francisco aims to combine a biblical education with an information technology and doctorate program in Ministry, whereas the University's Washington DC campus focuses on mission-based training in journalism and media communication.

18.     As a result of its successful programs and offerings, today the University is well recognized for its commitment to religious education and ministry training and has developed a strong following and reputation within the Christian community.

19.     The University uses the OLIVET UNIVERSITY name and trademark as

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

well as other OLIVET-formative marks in connection with faith-based educational offerings and religious services (together the "OLIVET Marks").

20.    The University advertises and promotes its faith-based educational offerings in connection with its OLIVET Marks, including on its website (as shown below):



21.    The University owns trademark rights in the OLIVET Marks, including common law rights and the following valid and subsisting U.S. federal trademark registrations:

| Mark | Reg. No. / Reg. Date | Goods/First Use in Commerce |
|------|---------------------|----------------------------|
| OLIVET UNIVERSITY | 4926123 Mar. 29, 2016 | Educational services, namely providing classes, courses, seminars, workshops, conferences and lectures of instruction at the undergraduate, graduate, post-graduate, adult education and professional levels in a wide variety of fields and providing on-line classes, courses, seminars, workshops, conferences and lectures of instruction at the |

4891-2971-0410.v1

| | | undergraduate, graduate, post-graduate, adult education and professional levels in a wide variety of fields via a global computer and telecommunications network. First Use in Commerce: March 3, 2004 |
|---|---|---|
|  | 6282606 March 2, 2021 | Sweatshirts; Shirts for adults and children; T-shirts for adults and children. First Use in Commerce: March 3, 2004 Educational services, namely, providing courses of instruction at the undergraduate, graduate, post-graduate, adult education and professional level and distribution of course material in connection therewith; Educational services, namely, providing classes, courses, seminars, workshops, conferences and lectures of instruction at the undergraduate, graduate, post-graduate, adult education and professional levels in the fields of theology, music, media and communication, art and design, technology, business, language and education, engineering and architecture. First Use in Commerce: March 3, 2004 |

22.   The above-listed registrations are prima facie evidence of the University's ownership and exclusive right to use and license these OLIVET Marks in commerce, and further constitute constructive notice of the University's ownership thereof.  The University has continuously used the above-listed OLIVET Marks since the first use dates listed above.

4891-2971-0410.v1

1

## OLIVET COLLEGE

2   23.    Defendant Olivet College is a liberal arts college located in the town of

3   Olivet, Michigan.

4   24.    The town of Olivet, Michigan is home not only to Defendant Olivet

5   College, but also to other schools named "Olivet", e.g., the Olivet Community

6   Schools, which include Olivet High School and Olivet Middle School.  *See*

7   https://www.olivetschools.org/.

8   25.    On information and belief, all of these "Olivet" schools based in Olivet,

9   Michigan—including Defendant—use the term "Olivet" in their names to describe

10  their geographical location in a town called "Olivet" in Michigan.

11  26.    While Defendant sometimes refers to itself as "Olivet College" in a

12  descriptive manner, it rarely (if ever) uses the mark OLIVET COLLEGE as a

13  trademark, opting instead to use the mark OLIVET 1844 COLLEGE.

14  27.    For example, Defendant uses the term OLIVET 1844 COLLEGE on its

15  website home page (as shown below), but not the mark OLIVET COLLEGE:

16

17

18

19   

20

21

22

23

24

25  28.    On information and belief, Defendant uses the mark OLIVET 1844

26  COLLEGE instead of the phrase OLIVET COLLEGE because the addition of "1844"

27  helps to distinguish Defendant from other educational institutions located in Olivet,

28

7

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT,
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL,
CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

Michigan.

29.     Defendant owns U.S. federal trademark registration no. 4524835 for the OLIVET COLLEGE mark (with "COLLEGE" disclaimed) (the "'835 Registration") for educational services in International Class 41, which issued May 6, 2014.

30.     The College also owns U.S. federal trademark application Serial No. 90491422 to register the mark OLIVET 1844 COLLEGE (and Design), as shown below:



31.     Although the '835 Registration issued with a December 31, 1844 first use date for the OLIVET COLLEGE trademark—approximately 178 years ago—Defendant did not file a federal trademark application for the OLIVET COLLEGE trademark until August 2, 2013.  On May 6, 2014, this application matured into the '835 Registration.

**THE PARTIES' 2015 TRADEMARK COEXISTENCE AGREEMENT**

32.     Between the year 2000 and April 29, 2015, the University and Defendant's respective uses of OLIVET UNIVERSITY and OLIVET COLLEGE peacefully coexisted without a single instance of actual confusion or perceived likelihood of confusion.

33.     On information and belief, during the 171-year period between 1844 and 2015, Defendant had not enforced or attempted to enforce its alleged trademark rights in the OLIVET COLLEGE mark.

34.     On April 29, 2015, Defendant's counsel wrote a letter to Plaintiff Olivet University at its address in Anza, California.  *See* April 29, 2015 Letter, a true and correct copy of which is attached hereto as Exhibit A.

8
COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

35.     In the April 29, 2015 Letter, Defendant's counsel wrote that the University's "recent advertising of the website for the Olivet College of Art & Design (OCAD) has highlighted your use of our client's trademark OLIVET COLLEGE and the resulting likelihood of confusion that is prohibited under trademark law." *Id.* at 1.

36.     Defendant's counsel also wrote in the April 29, 2015 Letter that Defendant "has used the name OLIVET COLLEGE since at least as early as 1844"; that Defendant owns "common law trademark right[s] accrued through its use for over 150 years" in such mark; that "[w]hile [Defendant] could object to your use of Olivet University as confusingly similar to their long used and registered mark, they have not done so"; and that Defendant also has not objected to "[the University's] use of "Olivet" and "College when the terms are separated, such as Olivet Theological College & Seminary[,]" only to "use of 'Olivet' and 'College' together[.]" *Id.*

37.     Critically, the April 29, 2015 Letter expressly stated that Defendant only wanted the University to stop using OLIVET directly followed by COLLEGE, and was "willing to accommodate [its] use of OLIVET in connection with its secondary educational services, so long as [sic] is not used in a manner that duplicates our entire mark, OLIVET COLLEGE." *Id.* at 2.

38.     Accordingly, on May 15, 2015, counsel for the University wrote in response to the April 29, 2015 Letter (hereinafter the "May 15, 2015 Letter") that the University "accepts such terms" as proposed in the April 29, 2015 Letter; wishes "to formalize and further clarify the terms of the coexistence agreement" between the University and Defendant by entering a written trademark coexistence agreement on the terms set forth in the May 15, 2015 Letter; and concluded the May 15, 2015 Letter with signature blocks for the University and Defendant.

39.     On May 19, 2015, Jackie M. Looser, a representative for Defendant, signed the May 15, 2015 Letter on behalf of Defendant as "Vice President Finance/Administration." *See id.* Per Defendant's website, Ms. Looser was

9

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

Defendant's Chief Financial Officer at the time she signed the May 15, 2015 Letter on behalf of Defendant:





40.     As Defendant's Chief Financial Officer, Ms. Looser had the authority to enter into a binding contractual agreement on behalf of Defendant.

41.     Accordingly, Defendant's conveyance through counsel of a signed copy of the May 15, 2015 Letter (with Ms. Looser's signature) was an offer from Defendant to the University to enter a trademark coexistence agreement on the terms of the May 15, 2015 Letter.

42.     On May 20, 2015, University representative Nathanael Tran, Vice President, countersigned the May 15, 2015 Letter.  As Vice President of the University, Nathanael Tran had the authority to enter into a binding contractual agreement on behalf of the University.

43.     Accordingly, when University representative Nathanael Tran countersigned the May 15, 2015 Letter on May 20, 2015, the University accepted Defendant's offer and the parties entered into a binding trademark coexistence agreement on the terms set forth in the May 15, 2015 Letter (the "2015 Agreement"). A true and correct copy of the 2015 Agreement is attached hereto as Exhibit B.

44.     As of May 20, 2015, the 2015 Agreement was binding on both the

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

University and Defendant and, since that time, the 2015 Agreement is and has remained in full force and effect.

45.     Critically, the 2015 Agreement allows the parties to freely use the term OLIVET in any way so long as the University does not use the exact phrase OLIVET COLLEGE, and so long as Defendant did not use the exact phrase OLIVET UNIVERSITY.

46.     The 2015 Agreement contained the following binding obligation (emphases added):

> *[Defendant]* acknowledges [the University's] ownership of and exclusive right to use and register the mark "Olivet University" in connection with education services and *agrees not to oppose, petition to cancel, or otherwise challenge or object to the use or any current registration and/or subsequent application for registration by [the University] of marks consist of or comprising the term "Olivet University."*

47.     The 2015 Agreement also contained the following binding obligation (emphases added):

> *In the event that the Parties become aware of any actual confusion or mistake* occurring as a result of their uses of their respective marks, ***the Parties agree to cooperate in good faith*** *to abate the cause of confusion or mistake* and to prevent any such confusion or mistake from arising again.

48.     The University complied with all of its obligations under the 2015 Agreement.

49.     For example, following full execution of the 2015 Agreement, the University stopped using OLIVET directly followed by COLLEGE.  In particular, the University rebranded its previously named "Olivet College of Art & Design

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

(OCAD)"—the use about which Defendant's April 29, 2015 Letter expressed concern—to the "Olivet School of Art & Design."  The University also rebranded as follows: Olivet College of Journalism became Olivet School of Media and Communication (OSMC); Olivet College of Art and Design became Olivet School of Art and Design (OSAD); Olivet College of Business became Olivet Business School (OBS); Olivet College of Language Education became Olivet School of Language and Education (OSLE).  In addition, the University's plans to launch the Olivet College of Engineering were modified to instead launch the Olivet School of Engineering and Architecture (OSEA).

50.     On May 29, 2015, nine (9) days after the 2015 Agreement was signed by Defendant, the University filed U.S. trademark application Serial No. 86645982 for the OLIVET UNIVERSITY mark, which matured into Registration No. 4926123 (the "'123 Registration").

51.     At no time during prosecution of U.S. trademark application Serial No. 86645982 did the USPTO refuse registration due to a likelihood of confusion with the '835 Registration.

52.     Between May 20, 2015 and March 25, 2021, the parties' respective uses of OLIVET UNIVERSITY and OLIVET COLLEGE peacefully coexisted without a single instance of actual confusion or perceived likelihood of confusion.

53.     Following the 2015 Agreement, and relying upon the parties' acknowledged and agreed to terms in the 2015 Agreement, the University has invested significant resources in continuing the advertising, promotion, and development of the OLIVET UNIVERSITY mark (and the University's other OLIVET-formative marks) that began as early as the year 2004.

54.     Such investments by the University included, but were not limited to developing its website; founding and building out various campuses around the country; marketing and advertising to promote the University's campuses and

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

programs under the OLIVET Marks; and developing goodwill in the OLIVET Marks among the relevant consumers.

### DEFENDANT'S OBJECTION TO OLIVET NAZARENE UNIVERSITY

55.    Olivet Nazarene University (hereinafter, referred to as "ONU") is a Christian university founded in 1907 and located in Bourbonnais, Illinois, approximately 200 miles away from Defendant in Olivet, Michigan.

56.    Between 1923 and 1939, ONU used the trademark OLIVET COLLEGE.

57.    On or about 1939, ONU transitioned away from OLIVET COLLEGE and began using the mark OLIVET NAZARENE UNIVERSITY instead.

58.    On information and belief, for approximately 16 years between 1923 and 1939, ONU's use of the name "Olivet College" coexisted with any commercial interstate use of the term "Olivet College" that Defendant might have made.

59.    On November 9, 2018, ONU filed two U.S. federal trademark applications, serial nos. 88187621 and 88187622 (together, the "ONU Applications"), to register the marks OLIVET NAZARENE UNIVERSITY and OLIVET NAZARENE UNIVERSITY (and Design), respectively (together, the "OLIVET NAZARENE Marks").

60.    On information and belief, ONU has used the OLIVET NAZARENE UNIVERSITY mark in connection with its educational services for many years, if not since 1986, when ONU claimed to have first used the mark for educational services.

61.    Nevertheless, on June 1, 2020—and, on information and belief, after up to a century or more of peaceful coexistence between Defendant and ONU's respective uses of OLIVET-formative marks, without a single instance of actual confusion—Defendant filed opposition to the ONU Applications before the U.S. Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("USPTO") objecting to the OLIVET NAZARENE Marks in opposition proceeding no. 91256107 (the "ONU Opposition Proceeding").

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

62.     On January 6, 2021, ONU withdrew its ONU Applications, causing them to go abandoned.

63.     On information and belief, ONU agreed to abandon its ONU Applications to settle the ONU Opposition Proceeding and avoid the costs of a trademark dispute with Defendant.

64.     On information and belief, Defendant filed the ONU Opposition Proceeding as part of a strategy to bully users of OLIVET-formative marks and force them to abandon their federal trademark applications or registrations, despite years of peaceful coexistence between such uses of OLIVET-formative marks confirming that confusion between them was unlikely.

65.     On information and belief, Defendant knew that its trademark objections to ONU, and to other users of OLIVET-formative marks, lacked merit because Defendant's use of OLIVET had for many years coexisted with such other uses, but Defendant nevertheless persisted with its objections, hoping that ONU and Defendant's other enforcement targets would capitulate to avoid the costs of litigation.

66.     On information and belief, at no time during the preparation, commencement, prosecution, or settlement of the ONU Opposition Proceeding did Defendant have a legitimate, good-faith belief or concern that ONU's use of OLIVET-formative marks gave rise to a likelihood of confusion between ONU and Defendant. This is another example of Defendant's improper tactics.

## DEFENDANT'S MATERIAL BREACHES OF THE 2015 AGREEMENT

67.     Just weeks after Defendant secured abandonment of the ONU Applications, Defendant turned its attention to its next target: Plaintiff Olivet University.

68.     However, because Defendant had already entered the binding 2015 Agreement—which required Defendant not to challenge the University's rights, and to cooperate with the University to address any perceived non-compliance that risked

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

consumer confusion—Defendant set out to devise a pretextual basis to terminate the 2015 Agreement and/or claim it was "void."

69.     Accordingly, on March 25, 2021, Defendant's counsel sent Plaintiff a one-page letter claiming that the University "has not performed under its commitment to cease all use of the designation of OLIVET COLLEGE by May 31, 2015."  The letter also claimed at the 2015 Agreement was "void ab initio" due to the University's alleged failure to perform.  A true and correct copy of this letter is attached hereto as Exhibit C (the "March 25, 2021 Letter").

70.     On March 26, 2021—just one day after sending the March 25, 2021 Letter, and without providing the University with any opportunity to respond, or to cure any perceived defects in its compliance with the 2015 Agreement—Defendant filed a petition to cancel the University's '123 Registration with the TTAB, initiating Cancellation Proceeding No. 92076800 (the "Cancellation Proceeding").

71.     In the March 25, 2021 Letter, Defendant did not offer a shred of detail or factual support for the assertion that the University has not performed its obligation to cease all use of the designation "OLIVET COLLEGE."

72.     Before sending the March 25, 2021 Letter, Defendant had made no effort whatsoever—during the six-year duration of the 2015 Agreement—to notify the University of any alleged noncompliance with the 2015 Agreement.

73.     The March 25, 2021 Letter was a false, manufactured, and/or pretextual basis for Defendant to claim that it was no longer obligated under the terms of the 2015 Agreement.

74.     If Defendant had genuine concerns about the University's compliance with the 2015 Agreement, it would have alerted the University to the specific alleged non-compliance, and given the University the information and time necessary to cure the alleged non-compliance.

75.     By petitioning to cancel the University's '123 Registration, Defendant

15

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

breached the 2015 Agreement, and specifically, Defendant's obligation "not to oppose, *petition to cancel*, or otherwise challenge or object to the use or any current registration… of marks consist[ing] of or comprising the term 'Olivet University.'"

76.     Defendant also breached the 2015 Agreement's requirement that the parties "cooperate in good faith to abate the cause of confusion or mistake and to prevent any such confusion or mistake from arising again" by failing to provide the University with an opportunity to cure the alleged non-compliance.

77.     Defendant also breached the covenant implied by law in the 2015 Agreement, which required the parties to communicate and cooperate in good faith to resolve any actual or perceived differences under the 2015 Agreement before resorting to litigation.

78.     On July 12, 2021, the University responded by pleading various affirmative defenses (including defenses seeking to enforce the 2015 Agreement), and counterclaimed in the Cancellation Proceeding, all to preserve its rights in view of Defendant's breach and repudiation of the 2015 Agreement.  Specifically, the University filed counterclaims to cancel Registration No. 4524835 (hereinafter, referred to as the " '835 Registration") on grounds of abandonment, fraud, and in the nature of a restriction (the "Cancellation Proceeding Counterclaims").

79.     Following Defendant's multiple, material breaches of the 2015 Agreement, as well as Defendant's repudiation of the 2015 Agreement, as alleged above, the University was justified in filing the Cancellation Proceeding Counterclaims in order to defend itself and preserve its rights in view of Defendant's breach and repudiation of the 2015 Agreement.

80.     Prior to filing the Cancellation Proceeding Counterclaims, the University had fulfilled all or substantially all of its obligations under the 2015 Agreement.

81.     Through Defendant's multiple, material breaches of the 2015 Agreement, as well as Defendant's repudiation of the 2015 Agreement, as alleged above,

4891-2971-0410.v1

Defendant unfairly interfered with the University's right to receive the benefits of the 2015 Agreement, namely, the benefit of continued, longstanding peaceful coexistence between the parties' respective marks.

82.     The University was harmed as a direct consequence of Defendant's multiple, material breaches of the 2015 Agreement, as well as Defendant's repudiation of the 2015 Agreement, as alleged above, including because such actions caused, and continue to cause, the University to incur significant legal fees to defend itself.

## INVALIDITY OF DEFENDANT'S ALLEGED TRADEMARK RIGHTS

83.     Although the 2015 Agreement obligates the University to refrain from challenging the validity of Defendant's alleged trademark rights in the OLIVET COLLEGE mark, and the University maintains that the 2015 Agreement (and all of its obligations, whether express or implied) is valid and enforceable, in the alternative, the University seeks a declaration that Defendant's alleged OLIVET COLLEGE trademark rights are invalid.

84.     Specifically, and to the extent the covenants of the 2015 Agreement are not enforceable for any reason, Defendant's '835 Registration, asserted in the Cancellation Action, should be cancelled, and all trademark rights in the OLIVET COLLEGE mark (including any common law rights) should be declared invalid on grounds of abandonment due at least to up to a century or more of uncontrolled use of the alleged OLIVET COLLEGE mark and failure to enforce any rights therein.

85.     Defendant's '835 Registration should also be cancelled on grounds of fraud on the USPTO, as Defendant secured this registration through false representations to the USPTO regarding (i) Defendant's ownership of the OLIVET COLLEGE mark and (ii) substantially exclusive use to support allegations of acquired distinctiveness, all with fraudulent intent.

86.     Because the '835 Registration is subject to cancellation, and Defendant's alleged rights are not entitled to a presumption of validity, *see* 15 U.S.C. § 1115, any

4891-2971-0410.v1

trademark rights Defendant claims to own in the OLIVET COLLEGE mark should be declared invalid for the independent reason that such mark lacks distinctiveness, as it is geographically descriptive of educational services offered through a college that is located in the town of Olivet, Michigan.

87.     Because the mark OLIVET COLLEGE is not inherently distinctive, is primarily geographically descriptive among the relevant consumers, and has not acquired distinctiveness among the relevant consumers, the University is entitled to a declaration that Defendant's alleged common law rights in the OLIVET COLLEGE mark are invalid.

### *Uncontrolled Use of the OLIVET COLLEGE Mark*

88.     In the Cancellation Action, Defendant alleges that "Defendant has used its OLIVET COLLEGE mark in U.S. commerce since at least as early as 1844." Petition for Cancellation in *Olivet College v. Olivet University*, Proceeding No. 92076800 ("Petition for Cancellation"), 1 TTABVUE 2 ¶ 2.  A true and correct copy of the Cancellation Petition is attached hereto as Exhibit D.

89.     However, Defendant was not formed at least until April 1920, did not legally exist in 1844, and could not have first "used" the name "Olivet College" over 75 years before it was formed.  *See id.*

90.     In truth, Defendant's allegation regarding 1844 as the year of first use refers to the year that Olivet *Institute* was founded.

91.     Defendant's website contains a "Circular" dated August 10, 1859, that discusses the formation of "Olivet Institute" in 1844.  A true and correct copy of the Circular from Defendant's website, available at https://www.olivetcollege.edu/about-olivet-college/hosford-history-center-and-lawrence-archives/archive-collection/, a true and correct copy of which is attached hereto as Exhibit E.

92.     The Circular contains the following statement (emphases, italics, and capitalizations in original):

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

Olivet College was organized in the year 1844, and application made to the Legislature of the State for a College Charter. The policy of the State at the time, however, was not to grant a *College* charter to *any* institution except the State University. Hence, the application of the Trustees was unsuccessful, and for several years the enterprise was prosecuted without a charter. At length the trustees thought it better, *as a temporary arrangement*, to organize as an *Institute*, rather than remain unchartered. They never, however, relinquished the purpose of obtaining a College charter at the earliest possible date, and of then re-organizing as a regular College. That long and fondly cherished purpose has, within the past year, been realized, and Olivet Institute has become what its founders ever intended it should be – OLIVET COLLEGE.

93.     A plaque located at Defendant's school also states that the school was "first chartered as Olivet Institute" (as shown below).



94.     President of Olivet College, Steven M. Corey, Ph.D., gave an inaugural address in 2011 that referenced an 1851 publication entitled Catalogue of the Officers and Students of the Olivet Institute.  *See* Olivet College Shipherd's Record Alumni

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

Magazine, Fall 2011, Page 8, available at

https://issuu.com/olivet123/docs/ship_r_fall_11, a true and correct copy of which is

attached hereto as Exhibit F.

95.  Olivet Institute was a separate legal entity from Defendant.

96.  The name "Olivet College" was not used for educational services in

connection with Defendant's school before 1859, as in truth, no institution named

"Olivet College" existed at that time.

97.  Alternatively, to the extent that the mark OLIVET COLLEGE was used

in commerce in connection with Defendant's school before 1859, such use was made

by Olivet Institute.

98.  In 1859, the State of Michigan issued a college charter for Defendant's

school in the name of "Olivet College."  *See* Exhibit E.  On information and belief,

this was the first time that Defendant's school could have been legally authorized to

refer to itself as "Olivet College."

99.  On information and belief, the issuance of this college charter in 1859

created a new legal entity (hereinafter, "Olivet Charter College").

100.  On information and belief, Olivet Charter College was at all times a legal

entity that was separate and distinct from Defendant.

101.  On information and belief, Olivet Charter College was at all times a legal

entity that was separate and distinct from Olivet Institute and took over operations of

Defendant's school from Olivet Institute on or about 1859.

102.  On information and belief, to the extent that the mark OLIVET

COLLEGE for educational services was used in connection with Defendant's school

prior to 1859, and to the extent such use was made by Olivet Institute, Olivet Institute

stopped using the mark on or about 1859, after Olivet Charter College took over

operations of Defendant's school.

103.  On information and belief, to the extent that the mark OLIVET

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT,
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL,
CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

COLLEGE was used in connection with Defendant's school between 1859 and 1920, such use was made by Olivet Charter College, not by Olivet Institute or Defendant.

104.   On information and belief, Olivet Institute never transferred any trademark rights in the OLIVET COLLEGE mark to Olivet Charter College.

105.   On information and belief, Olivet Institute never attempted to transfer any trademark rights in the OLIVET COLLEGE mark to Olivet Charter College by executing a trademark assignment or similar transfer agreement.

106.   On information and belief, Olivet Institute never controlled the quality of the educational services that Olivet Charter College offered under the OLIVET COLLEGE mark.

107.   On information and belief, Olivet Institute never executed a license agreement or other agreement that gave Olivet Institute control over the quality of educational services that Olivet Charter College offered under the OLIVET COLLEGE mark.

108.   In 1920, Defendant was formally organized under the laws of the State of Michigan as a legal entity through the filing of Articles of Incorporation. A true and correct copy of Defendant's corporate records from the State of Michigan website is attached as Exhibit G.

109.   On information and belief, Defendant was at all times a legal entity that was separate and distinct from Olivet Institute and Olivet Charter College.

110.   On information and belief, Defendant took over operations of Defendant's school from Olivet Charter College on or about 1920.

111.   On information and belief, to the extent that the mark OLIVET COLLEGE for educational services was used in connection with Defendant's school between 1859 and 1920, and to the extent such use was made by Olivet Charter College, Olivet Charter College stopped using the mark on or about 1920, after Defendant took over operations of Defendant's school.

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

112.   On information and belief, Olivet Charter College never transferred any trademark rights in the OLIVET COLLEGE mark to Defendant.

113.   On information and belief, Olivet Charter College never attempted to transfer any trademark rights in the OLIVET COLLEGE mark to Defendant by executing a trademark assignment or similar transfer agreement.

114.   On information and belief, Defendant does not possess a copy of any trademark assignment or similar transfer agreement transferring trademark rights in the OLIVET COLLEGE mark from Olivet Institute to Olivet Charter College.

115.   On information and belief, Defendant does not possess a copy of any trademark assignment or similar transfer agreement transferring trademark rights in the OLIVET COLLEGE mark from Olivet Charter College to Defendant.

116.   On information and belief, either Olivet Institute or Olivet Charter College was and remains the true owner of OLIVET COLLEGE for educational services, depending upon which of them first used the OLIVET COLLEGE mark.

117.   On information and belief, to the extent Olivet Institute and/or Olivet Charter College first used the OLIVET COLLEGE mark, Defendant could not take ownership of the OLIVET COLLEGE trademark unless the true owner of such trademark rights (i.e., Olivet Institute, Olivet Charter College, or their successor(s)-in-interest, if any) transferred such trademark rights to Defendant.

118.   On information and belief, trademark rights in the mark OLIVET COLLEGE for educational services were never transferred to Defendant by the true owner of the OLIVET COLLEGE trademark.

119.   On information and belief, because trademark rights in the OLIVET COLLEGE trademark never transferred to Defendant, Defendant is not and never was the true owner of the OLIVET COLLEGE trademark.

120.   On information and belief, the true owner of the OLIVET COLLEGE trademark does not control the quality of the educational services that Defendant

offers and has offered under the OLIVET COLLEGE mark since 1920.

121.   On information and belief, the true owner of the OLIVET COLLEGE trademark never executed a license agreement or other agreement that gives such owner control over the quality of educational services that Defendant offers under the OLIVET COLLEGE mark.

122.   As a consequence of this failure and inability to control the quality of services offered under the OLIVET COLLEGE trademark, such mark has lost whatever significance it may have had as a source indicator, and any trademark rights previously owned in the OLIVET COLLEGE trademark have abandoned as a consequence of naked licensing of the OLIVET COLLEGE trademark.

123.   Because Defendant, Olivet Institute and Olivet Charter College pursued a course of conduct that caused the OLIVET COLLEGE trademark to lose its significance as a trademark, namely, by failing to enforce any rights in that mark against third-party uses of OLIVET COLLEGE and confusingly similar marks for many years, if not decades, any trademark rights previously owned in the OLIVET COLLEGE trademark have abandoned as a consequence of failure to enforce such rights.

124.   Accordingly, the trademark rights in the OLIVET COLLEGE trademark that Defendant alleged in the Cancellation Proceeding should be declared abandoned within the meaning of Section 45 of the Trademark Act, 15 U.S.C. §1127 and the '835 Registration for the OLIVET COLLEGE mark should be cancelled in its entirety.

### *Olivet College and its Fraudulent Procurement of the '835 Mark*

125.   On August 2, 2013, Defendant filed application Serial No. 86027170 to register the mark OLIVET COLLEGE for "[e]ducational services, namely, providing courses of instruction at the college level" in Class 41, which matured into the '835 Registration.

126.   Application Serial No. 86027170 was filed with a specimen of use that

4891-2971-0410.v1

appears to be taken from Defendant's website available at www.olivetcollege.edu. A true and correct copy of Defendant's specimen of use is attached hereto as Exhibit H.

127. Defendant's application Serial No. 86027170 claims that the OLIVET COLLEGE mark was first used in commerce on December 31, 1844, approximately 169 years before Defendant filed its application Serial No. 86027170.

128. The application Serial No. 86027170 was signed by William Kurtz as Senior Vice President of Olivet College.

129. William Kurtz, the signatory to application Serial No. 86027170, no longer works for Olivet College.

130. On August 2, 2013, in connection with application Serial No. 86027170, Mr. Kurtz signed the following declaration on behalf of Defendant under penalty of perjury (the "August 2, 2013 Declaration") (emphases added below):

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant***; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered***, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief ***no other person, firm, corporation, or association has the right to use the mark in commerce***, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; ***and that all statements made on information and belief are believed to be true.***

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

131.   William Kurtz, the signatory to application Serial No. 86027170, knew that Defendant's school was first chartered as "Olivet Institute" at the time Mr. Kurtz signed application Serial No. 86027170.

132.   President of Olivet College, Steven M. Corey, Ph.D., gave an inaugural address on September 7, 2011 (the "September 7, 2011 Inaugural Address"), in which he said the following: "At the time of our founding, our curriculum was committed to the traditions of the liberal arts. A review of the Catalogue of the Officers and Students of the **Olivet Institute** of 1851 outlines six major areas of study…"  *See* Exhibit F at 8 (emphasis added).

133.   William Kurtz attended the September 7, 2011 Inaugural Address; in fact, he delivered the closing remarks that day.  *See id.* at 11.

134.   Because William Kurtz attended the September 7, 2011 Inaugural Address, and heard the President of Olivet College, Steven M. Corey, Ph.D., refer to the "Olivet Institute of 1851," William Kurtz knew, at least as of September 7, 2011, that Defendant's school was first named "Olivet Institute," not Olivet College.

135.   Moreover, William Kurtz read and/or was familiar with the plaque located at Defendant's school, which states that the school was "first chartered as Olivet Institute."

136.   Despite knowing that Defendant's school was first chartered as "Olivet Institute," a separate entity; that Defendant's school did not refer to itself as "Olivet College" before 1859 (*see supra* Paragraph 92, Exhibit E); and that, to the extent Defendant's school referred to itself as "Olivet College" before 1859, such use could not have been undertaken by Defendant (which did not yet exist) (*id.*), William Kurtz, the signatory to application Serial No. 86027170, still signed the August 2, 2013 Declaration attesting that Defendant was the owner of the mark OLIVET COLLEGE; that the OLIVET COLLEGE mark was *first used in 1844*; and that "no other person, firm, corporation, or association has the right to use the mark in commerce."

4891-2971-0410.v1

137.   Kurtz knew this August 2, 2013 Declaration was false when he signed it.

138.   Kurtz acted with reckless disregard for the truth of the August 2, 2013 Declaration when he signed it.  For example, because Kurtz knew that Defendant's school was named "Olivet Institute" in 1851 (*see supra,* Paragraph 137), he also knew that Defendant's use of the OLIVET COLLEGE mark could not have begun in 1844. Nevertheless, Kurtz signed an application Serial No. 86027170 stating, under penalty of perjury, that Defendant's use of the OLIVET COLLEGE mark began in 1844.

139.   Mr. Kurtz did not review documents transferring ownership of rights in the OLIVET COLLEGE trademark to Defendant before Mr. Kurtz signed application Serial No. 86027170 at least because, on information and belief, such documents do not exist.

140.   Kurtz signed the August 2, 2013 Declaration on behalf of Defendant, and with knowledge that such Section 2(f) Declaration was false in order to deceive the USPTO to issue a registration for the OLIVET COLLEGE mark to which Defendant was not entitled.

141.   Kurtz signed the attestation in the August 2, 2013 Declaration on behalf of Defendant, and with reckless disregard for the truth of the statements contained in the Declaration in order to deceive the USPTO to issue a registration for the OLIVET COLLEGE mark to which Defendant was not entitled.

142.   The August 2, 2013 Declaration contained material misstatements that formed the basis for the PTO to register Defendant's OLIVET COLLEGE mark, and, but for those material misstatements, the USPTO would not have issued the '835 Registration.

143.   In signing the fraudulent Section 2(f) Declaration, Kurtz intended to procure a registration that Kurtz knew Defendant was not entitled to, or alternatively, acted with reckless disregard for the truth of the assertions in the fraudulent Section 2(f) Declaration in order to procure a registration to which Defendant was not entitled.

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

144.   On the grounds set forth above, Defendant engaged in civil fraud within the meaning of 15 U.S.C. § 1120 in procuring the '835 registration, by making false and/or fraudulent representations of material fact to the USPTO in order to obtain a registration for its OLIVET COLLEGE mark.

### *Olivet College's Fraudulent Section 2(f) Claim of Acquired Distinctiveness*

145.   On November 18, 2013, the USPTO issued an office action refusing registration of application Serial No. 86027170, finding that the mark OLIVET COLLEGE was not inherently distinctive, and unregistrable absent proof of secondary meaning. The office action also stated that "[t]he application record indicates *that applicant has used its mark for a long time*; therefore, applicant can seek registration on the Principal Register under Trademark Act Section 2(f), based on acquired distinctiveness." (Emphasis added).

146.   On December 13, 2013, Defendant responded to the office action dated November 18, 2013, by adding a Section 2(f) claim.

147.   In connection with Defendant's 2(f) claim, William Kurtz signed the following declaration on behalf of Defendant under penalty of perjury (the "Section 2(f) Declaration") (emphases added below):

> Section 2(f) Claim of Acquired Distinctiveness, based on Five or More Years' Use:
>
> The mark has become distinctive of the goods/services through the applicant's **substantially exclusive** and continuous use in commerce that the U.S. Congress may lawfully regulate **for at least the five years immediately before the date of this statement**.

148.   On information and belief, the Section 2(f) Declaration was false because Defendant's use of the mark OLIVET COLLEGE was not "substantially exclusive"

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

for at least the five years immediately before December 13, 2013.

149.    For example, non-parties ONU, Olivet High School, Olivet Middle School, and Olivet Elementary School were all using OLIVET for educational services during the five years immediately before the Section 2(f) Declaration.

150.     Kurtz knew Defendant's use of the mark OLIVET COLLEGE was not substantially exclusive for at least the five years immediately before December 13, 2013 at the time he made the Section 2(f) Declaration because he knew about, and was familiar with, all of the OLIVET-formative school names mentioned above.

151.    Specifically, Kurtz knew that Defendant's school was not making substantially exclusive use of OLIVET at least because Kurtz knew that Olivet Community Schools, comprised of Olivet High School, Olivet Middle School, and Olivet Elementary School, were also using OLIVET for educational services within the Olivet School District.

152.    On May 14, 2010, Kurtz—who had served as vice president and chief financial officer for Olivet College since 2008—was elected as acting president of Olivet College by the Board of Trustees of Olivet College.

153.    On May 15, 2010, Olivet College held its 2010 commencement for the graduating class that year ("2010 Commencement").  *See* Olivet College Shipherd's Record Alumni Magazine, Spring 2010, Page 4, available at https://issuu.com/olivet123/docs/ship_r_spring_10, a true and correct copy of which is attached hereto as Exhibit I.

154.    As Defendant's acting president, Kurtz attended the 2010 Commencement.

155.    The 2010 Commencement speaker was David Campbell, who at that time was superintendent at Olivet Community Schools, which includes Olivet High School, Olivet Middle School, and Olivet Elementary School, and Mr. Campbell was introduced as Olivet Community Schools superintendent.  *See id*.

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

156.   In fact, as of the 2010 Commencement, Kurtz, in his capacity as acting president of Olivet College, bestowed on Mr. Campbell a Doctor of Humane Letters, *honoris causa*, from Olivet College in honor of his work as superintendent at Olivet Community Schools.  *See id*.

157.   Because Kurtz attended the 2010 Commencement, where Mr. Campbell spoke as superintendent of Olivet Community Schools, and bestowed on Mr. Campbell a Doctor of Humane Letters, *honoris causa*, from Olivet College, Kurtz knew, at least as of the 2010 Commencement (if not before) that other institutions used OLIVET for educational services.

158.   Because the 2010 Commencement occurred during the five years immediately before the date of the Section 2(f) Declaration, Kurtz knew that other educational institutions were using OLIVET for educational services during such time, and that Defendant's use of the OLIVET mark for educational services was not "substantially exclusive" during such time; and, accordingly, that the statement in the Section 2(f) Declaration that Defendant's use was "substantially exclusive" was false.

159.   Moreover, Kurtz knew of Olivet Nazarene University's ("ONU") use of OLIVET for educational services during the five years immediately preceding the date of the Section 2(f) Declaration at least because Defendant's school sports teams, the Olivet Comets, competed against ONU's Olivet Tigers in NCAA Division III sports between 2008 and 2013.

160.   For example, on September 30, 2011, Defendant's women's volleyball team competed against ONU's women's volleyball team as demonstrated by the information on Defendant's website (as shown below):

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

*See* https://olivetcomets.com/sports/wvball/2011-12/boxscores/20110930_4pde.xml, a true and correct copy of which is attached hereto as Exhibit J.

161.   As Defendant's acting president in 2011, Kurtz knew that Defendant's sports teams competed against ONU's sports teams in NCAA Division III sports during the five years immediately preceding the date of the Section 2(f) Declaration, and at least as of September 30, 2011, when Defendant's women's volleyball team competed against ONU's women's volleyball team.

162.   Because Kurtz knew that Defendant's sports teams competed against ONU's sports teams in NCAA Division III sports during the five years immediately preceding the date of the Section 2(f) Declaration, Kurtz knew that other educational institutions were using OLIVET for educational services during such time; that Defendant's use of the OLIVET mark for educational services was not "substantially exclusive" during such time; and, accordingly, that the statement in the Section 2(f) Declaration that Defendant's use was "substantially exclusive" was false.

163.   Kurtz signed the Section 2(f) Declaration on behalf of Defendant, and with knowledge that such Section 2(f) Declaration was false in order to deceive the USPTO to issue a registration for the OLIVET COLLEGE mark to which Defendant was not entitled.

164.   Kurtz signed the attestation in the Section 2(f) Declaration on behalf of

30

4891-2971-0410.v1

Defendant, and with reckless disregard for the truth of the statements contained in the Section 2(f) Declaration in order to deceive the USPTO to issue a registration for the OLIVET COLLEGE mark to which Defendant was not entitled.

165.   The Section 2(f) Declaration contained material misstatements that formed the basis for the USPTO to register Defendant's OLIVET COLLEGE mark (*see supra* Paragraphs 150, 161), and, but for those material misstatements, the USPTO would not have issued the '835 Registration.

166.   In signing the fraudulent Section 2(f) Declaration, Kurtz intended to procure a registration that Kurtz knew Defendant was not entitled to, or alternatively, acted with reckless disregard for the truth of the assertions in the fraudulent Section 2(f) Declaration in order to procure a registration to which Defendant was not entitled.

167.   On the grounds set forth above, Defendant engaged in civil fraud within the meaning of 15 U.S.C. § 1120 in procuring the '835 registration, by making false and/or fraudulent representations of material fact to the USPTO in order to obtain a registration for its OLIVET COLLEGE mark.

### OLIVET COLLEGE is primarily geographically descriptive of Defendant's services

168.   Defendant Olivet College is a college located in the town of Olivet, Michigan.

169.   Approximately 93% of Defendant's student body is comprised of Michigan residents.

170.   On information and belief, Defendant's actual and potential students who come into contact with Defendant's alleged OLIVET COLLEGE mark are almost entirely Michigan residents familiar with the town of Olivet, Michigan.

171.   On information and belief, such consumers are familiar with the many other OLIVET-formative names of schools, businesses, and organizations located in the town of Olivet, Michigan.  A true and correct copy of search results from the

31

4891-2971-0410.v1

Michigan Department of Licensing and Regulatory Affairs Corporations Online Filing System website is attached hereto as Exhibit K.

172.   Due to the high number of schools, businesses, and organizations with OLIVET-formative names in the town of Olivet, Michigan, such consumers are conditioned to recognize that those schools, businesses, and organizations with OLIVET-formative names adopt and use those names in order to refer to the location where their goods and services are provided, i.e., in the town of Olivet, Michigan.

173.   Accordingly, such consumers understand the primary significance of the OLIVET COLLEGE mark is a geographic location—the town of Olivet, Michigan—as that is where Defendant's services are provided.

174.   In fact, even Defendant's President has referred to the school in a geographically descriptive manner.  At the September 7, 2011 Inaugural Address, the President of Olivet College, Steven M. Corey, Ph.D., said "[w]hen Father John Shipherd and the others with him committed to founding *a **college** here in **Olivet,*** they did so with the intent of extending work he had done in the founding of Oberlin College some 11 years earlier."  *See* Exhibit F at 7-8 (emphasis added).

175.   The mark OLIVET COLLEGE is primarily geographically descriptive.

176.   Defendant's OLIVET COLLEGE mark for educational services is descriptive of educational services offered through a college located in the town of Olivet, Michigan.

177.   The OLIVET COLLEGE mark is not inherently distinctive.

178.   As outlined above, the mark OLIVET COLLEGE has not acquired distinctiveness through continuous and substantially exclusive use over time.

179.   Because the mark OLIVET COLLEGE is not distinctive it cannot be protected as a trademark.

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

1
2
3

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**

### **Breach of the 2015 Agreement**

4      180.   Plaintiff repeats and realleges each and every allegation set forth above.

5      181.   The 2015 Agreement is valid, binding, and enforceable.

6      182.   Under the 2015 Agreement, Defendant was obligated not to "oppose,

7   petition to cancel, or otherwise challenge" the University's trademark registration for

8   the OLIVET UNIVERSITY trademark, and to cooperate in good faith with the

9   University.  Such terms were material terms of the 2015 Agreement.

10      183.   Plaintiff performed all or substantially all of its obligations under the

11   2015 Agreement.  Any use of "Olivet College" during the term of the 2015 Agreement

12   to refer to the University and that appeared inconsistent with the 2015 Agreement was

13   undertaken by third parties other than the University, and the University's cancellation

14   counterclaims in the Cancellation Action, as well as the claim in the alternative for

15   declaratory judgment of invalidity in this action, are justifiable at least under the

16   doctrine that a material breach excuses a non-breaching party's performance.

17      184.   Defendant materially breached the 2015 Agreement by repudiating the

18   2015 Agreement, by failing to cooperate with the University in good faith, and by

19   initiating the Cancellation Action against the University's '123 Registration.  Such

20   breaches were not excusable or justifiable and were undertaken for the bad faith

21   purpose of Defendant's desire to extricate itself from the 2015 Agreement and bully

22   other users of "Olivet" names and marks to abandon their trademark rights.

23      185.   As a result of, and as a natural and probable consequence of Defendant's

24   breaches, as set out in the immediately preceding paragraph, Plaintiff has suffered

25   damages in an amount to be determined at trial, including but not limited to forcing

26   the University to incur legal defense costs in excess of $75,000.

27
28

4891-2971-0410.v1

## SECOND CLAIM FOR RELIEF

### Promissory Estoppel

186.   Plaintiff repeats and realleges each and every allegation set forth above.

187.   Plaintiff alleges, in the alternative, that Plaintiff is entitled to recover under the doctrine of promissory estoppel if, for any reason, Plaintiff cannot prevail on its breach of contract claim.

188.   As alleged above, Defendant promised not to petition to cancel, or otherwise challenge the University's registrations for OLIVET UNIVERSITY, and was in a position to fully perform, fulfill, and carry out the terms and conditions of that promise to maintain the then-15-year status quo between the parties, and in fact, did carry out and honor that promise for approximately six years after the promise was made.

189.   Defendant breached and reneged on that promise when Defendant filed the Cancellation Action challenging the validity of the '123 Registration.

190.   It was reasonably foreseeable that Defendant's promises would cause or induce Plaintiff to act in reasonable reliance on Defendant's promises and Plaintiff did rely on such promises, including by investing significant resources in the OLIVET UNIVERSITY mark over an approximate six-year period between 2015, when Defendant's promise was made, and 2021, when Defendant reneged on that promise by filing the Cancellation Action, causing a substantial change in Plaintiff's position.

191.   As a result of Defendant's failure to make good on its promise, and Plaintiff's  detrimental reliance on such promise, Plaintiff suffered harm in an amount to be determined at trial, but not less than $75,000.

192.   Injustice can be avoided only by enforcement of the Defendant's promises, as otherwise Plaintiff will be forced to expend considerable litigation and/or rebranding costs, and will lose valuable goodwill in its OLIVET UNIVERSITY mark developed since 2015.

## THIRD CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

193.    Plaintiff repeats and realleges each and every allegation set forth above.

194.    The Defendant materially breached the implied covenant of good faith and fair dealing by depriving Plaintiff of the benefits of the 2015 Agreement.

195.    Specifically, Defendant materially breached the covenant of good faith and fair dealing implied by law in the 2015 Agreement by repudiating the 2015 Agreement and claiming it to be "void ab initio" as a pretext to challenge Plaintiff's '123 Registration; by failing to cooperate with the University in good faith regarding perceived issues of alleged non-performance by the University; and by immediately— and, specifically, the *day after* Defendant notified the University for the first time of allegations of non-compliance—initiating the Cancellation Action against the University's '123 Registration without first attempting in good faith to address the University's alleged non-compliance with the 2015 Agreement.

196.    Such breaches were not excusable or justifiable and were undertaken for the bad faith purpose of Defendant's desire to extricate itself from the 2015 Agreement, challenge the '123 Registration, and force the University and other lawful users of "Olivet" names and marks for educational services to abandon their registered trademark rights.

197.    As a result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount to be determined at trial, including but not limited to forcing the University to incur legal defense costs in excess of $75,000.

## FOURTH CLAIM FOR RELIEF

### Declaratory Judgement of Invalidity of the OLIVET COLLEGE Mark

### Pursuant to 28 U.S.C. § 2201, 15 U.S.C. § 1119

198.    Plaintiff repeats and realleges each and every allegation set forth above.

4891-2971-0410.v1

199.   Although the 2015 Agreement obligates the Plaintiff to refrain from challenging the validity of Defendant's alleged trademark rights in the OLIVET COLLEGE mark, and Plaintiff maintains that the 2015 Agreement (and its express and implied covenants) are valid and enforceable, in the alternative, Defendant's alleged trademark rights in the OLIVET COLLEGE mark and '835 Registration are invalid.

200.   Specifically, to the extent such mark has ever operated as an indicator of source, Defendant's '835 Registration is invalid and subject to cancellation on grounds of abandonment due to as much as a century or more of uncontrolled use and failure to enforce the OLIVET COLLEGE mark, causing Defendant's alleged trademark OLIVET COLLEGE to no longer function as an indicator of source, as alleged above.

201.   Defendant's '835 Registration should also be cancelled on grounds of fraud on the USPTO, as Defendant secured the '835 Registration through false representations to the USPTO regarding Defendant's ownership of the OLIVET COLLEGE mark and its substantially exclusive use to support allegations of acquired distinctiveness, all with fraudulent intent, as alleged above.

202.   Because the '835 Registration is subject to cancellation, and Defendant's alleged rights are not entitled to a presumption of validity, *see* 15 U.S.C. § 1115, Defendant's alleged trademark rights in OLIVET COLLEGE are invalid because such mark, as among the relevant consumers, is not distinctive; is primarily geographically descriptive of the town of Olivet, Michigan, where Defendant's educational services are offered; and has not acquired distinctiveness.

203.   As a result of the acts described in the preceding paragraphs, including but not limited to the Cancellation Action, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Defendant owns no valid trademark rights in the OLIVET COLLEGE trademark.

204.   A judicial declaration is necessary and appropriate so that Plaintiff may

4891-2971-0410.v1

be free from continued litigation in the Cancellation Action, and may continue its use of the OLIVET Marks without threat of future trademark litigation and enforcement.

205.   Accordingly, Plaintiff is entitled to a declaratory judgment that Defendant owns no valid trademark rights in the OLIVET COLLEGE trademark in connection with educational services.

## FIFTH CLAIM FOR RELIEF

### Civil Fraud Pursuant to the Lanham Act, 15 U.S.C. § 1120

206.   Plaintiff repeats and realleges each and every allegation set forth above.

207.   As alleged above in the fourth claim for relief, Defendant engaged in civil fraud within the meaning of 15 U.S.C. § 1120 in procuring the '835 registration by making false and/or fraudulent representations of material fact to the USPTO in order to obtain the '835 Registration.

208.   As a result of Defendant's fraudulent conduct in violation of 15 U.S.C. § 1120, and as alleged above, Plaintiff has suffered damages in an amount to be determined at trial, including but not limited to forcing the University to incur legal defense costs in excess of $75,000.

## SIXTH CLAIM FOR RELIEF

### Unfair Competition Pursuant to Cal. Bus. & Prof. Code § 17200

209.   Plaintiff repeats and realleges each and every allegation set forth above.

210.   Defendants violated California Business and Professions Code § 17200 by engaging in business acts or practices that were unlawful, unfair, and fraudulent.

211.   Defendant engaged in unlawful business practices by breaching the 2015 agreement as alleged above, and by engaging in civil fraud as alleged above.

212.   Defendant engaged in fraudulent business practices by engaging in fraud on the USPTO and civil fraud, as alleged above.

213.   Defendant engaged in unfair business practices by pretextually terminating the 2015 Agreement, without justification, without providing Plaintiff

with an opportunity to cure the perceived non-compliance and maintain the status quo, and without attempting to avoid litigation and instead instituting the Cancellation Action, all for the bad faith purpose of bullying the University into abandoning its lawfully obtained federal trademark registrations, and without any legitimate, good-faith belief or concern that the University's use of its OLIVET Marks gave rise to a likelihood of confusion between the University and Defendant.

214. As a direct and proximate result of Defendant's unfair competition in violation of California Business and Professions Code § 17200, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to forcing the University to incur legal defense costs in excess of $75,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including the following:

A. An Order declaring that the 2015 Agreement is valid and in full force and effect;

B. An Order enjoining Defendant from violating any of the provisions of the 2015 Agreement, including but not limited to the prohibition on challenging the validity of Plaintiff's trademark registrations for the OLIVET UNIVERSITY and OLIVET (and Design) marks.

C. An Order directing the Director of the U.S. Patent and Trademark Office to dismiss, with prejudice, Defendant's cancellation claims pending in the Cancellation Action now pending before the U.S. Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office, and to dismiss, without prejudice, Plaintiff's affirmative defenses and counterclaims pending in the Cancellation Action.

D. An Order, in the alternative, directing the Director of the U.S. Patent and Trademark Office to cancel the '835 Registration on grounds of abandonment and

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

fraud, pursuant to 28 U.S.C. § 2201, 15 U.S.C. §§ 1119.

      E.    An Order, in the alternative, directing the Director of the U.S. Patent and Trademark Office to expressly abandon with prejudice trademark application Serial No. 90491422 and any resulting registration, and any other applications/registrations for trademarks or service marks consisting of or containing the invalid OLIVET COLLEGE trademark, pursuant to 28 U.S.C. § 2201, 15 U.S.C. § 1119.

      F.    An Order, in the alternative, declaring Defendant's trademark rights in the OLIVET COLLEGE mark invalid on grounds of abandonment.

      G.    An Order, in the alternative, declaring Defendant's trademark rights in the OLIVET COLLEGE mark invalid on grounds that such mark is primarily geographically descriptive, has not acquired secondary meaning, and as such, does not function as a trademark.

      H.    An Order requiring Defendant to pay damages to Plaintiff in an amount as yet undetermined and as a consequence of Defendant's civil fraud under the Lanham Act, 15 U.S.C. § 1120.

      I.    An Order requiring Defendant to pay damages to Plaintiff in an amount as yet undetermined and as a consequence of Defendant's violations of California's Unfair Competition Law ("UCL"), Business and Professions Code §§ 17200 et seq.

      J.    An Order requiring Defendant to pay damages in an amount as yet undetermined and as a consequence of Defendant's breach of contract.

      K.    An order requiring Defendant to pay Plaintiff its costs and attorneys' fees in this action under applicable laws.

      L.    All other relief as the Court may deem appropriate.

4891-2971-0410.v1

DATED:
January 23, 2023

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By:        /s/ Carolyn S. Toto

CAROLYN S. TOTO (SBN 233825)
carolyn.toto@pillsburylaw.com
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
Telephone: (213) 488-7238
Facsimile: (213) 629-1033

SAMUEL V. EICHNER (pro hac vice to be
filed)
sam.eichner@pillsburylaw.com
31 West 52nd St.
New York, NY 10019
Telephone: (212) 858-1154
Facsimile: (212) 858-1500

Attorneys for Plaintiff
OLIVET UNIVERSITY

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT,
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL,
CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and Central District of California L.R. 38-1, Plaintiff demands a trial by jury on all issues so triable.

DATED:
January 23, 2023

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ Carolyn S. Toto

CAROLYN S. TOTO (SBN 233825)
carolyn.toto@pillsburylaw.com
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
Telephone: (213) 488-7238
Facsimile: (213) 629-1033

SAMUEL V. EICHNER (pro hac vice to be filed)
sam.eichner@pillsburylaw.com
31 West 52nd St.
New York, NY 10019
Telephone: (212) 858-1154
Facsimile: (212) 858-1500

Attorneys for Plaintiff
OLIVET UNIVERSITY

COMPLAINT FOR DECLARATORY JUDGMENT FOR TRADEMARK INVALIDITY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, CIVIL FRAUD, AND VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW

4891-2971-0410.v1